IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

STEPHEN SCHLEIG,

    Plaintiff,

v.

BOROUGH OF NAZARETH, et al,

    Defendants.

CIVIL ACTION
NO. 15-4550

## MEMORANDUM OPINION

**Schmehl, J.** /s/ JLS                                                                                                August 20, 2018

### I. INTRODUCTION

Plaintiff, Stephen Schleig, brings this suit against his former employer, the Borough of Nazareth, as well as Chief Thomas Trachta, Mayor Carl Strye, Jr., Officer Daniel Troxell and Officer Randall Miller (collectively "Defendants,") pursuant to 42 U.S.C. § 1983. Plaintiff asserts various claims against the Defendants for their alleged retaliation against him for his engaging in First Amendment protected union activity. Before the Court is the Motion for Summary Judgment of Defendants, Defendants' Statement of Undisputed Facts, and Plaintiff's Opposition to Defendants' Motion for Summary Judgment, as well as Defendants' reply. For the following reasons, Defendants' motion is granted.

### II. LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. Proc. 56(c). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact."

*Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." *Pignataro v. Port Auth. of N.Y. and N.J.*, 593 F.3d 265, 268 (3d Cir. 2010) (citing *Reliance Ins. Co. v. Moessner*, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250.

### III. FACTUAL BACKGROUND

Plaintiff was hired as a full-time police officer by the Borough of Nazareth on December 3, 2008, and sworn in on March 3, 2009. (Joint Statement of Material Facts ("SOF", ¶¶ 3-4.) For the first year, Plaintiff was a probationary employee and was a member of the local bargaining unit, but was not a member of the union. (*Id*., ¶¶ 5-6.) When Plaintiff's probationary period was ending, then-Deputy Chief Thomas Trachta ("Trachta") recommended to the Borough Council that he be hired on a permanent basis. (*Id*., ¶¶ 8, 10.) At this time, Plaintiff was already a member of the Police Association (Id.,

2

¶ 11.) As an officer in the Police Association, Plaintiff handled various grievances with the help of an attorney. (SOF, ¶¶ 12-13.)

It is undisputed that Plaintiff had performance issues while a police officer with Defendant Borough. On February 7 and February 15, 2011, Trachta prepared memoranda regarding his concerns over Plaintiff's handling of two incidents. (*Id.*, ¶¶ 15-16.) On February 16, 2011, Plaintiff was given a formal counseling regarding his failure to follow a direct order, and Plaintiff signed that he accepted that counseling. (*Id.*, ¶¶ 16-17.) On March 31, 2011, Trachta prepared an annual performance evaluation for Plaintiff, which rated his overall performance as "Improvement Needed." (*Id.*, ¶¶ 19-20.) On May 12, 2011, Trachta sent a memo to Mr. Lahovski, Plaintiff's Field Training Officer, regarding Plaintiff's poor performance in responding to a call. (*Id.*, ¶24.)

On July 7, 2011, the Police Associate filed a grievance on behalf of all full-time officers regarding shift-differential pay, and on February 16, 2012, Lahovski filed a grievance on behalf of the Police Association regarding the scheduling of 12 hour shifts. (*Id.*, ¶¶ 26-27.) On March 13, 2012, former-Mayor Daugherty granted the February 16, 2012, grievance and returned the police department to 12 hour shifts. (*Id.*, ¶28.)

On April 12, 2012, Trachta prepared Plaintiff's annual performance evaluation, and again rated Plaintiff's overall performance as "Needs Improvement." (*Id.*, ¶¶ 31-32.) On May 17, 2012, the Police Association filed a grievance regarding the assignment of open shifts to part-time police officers, and on June 19, 2012, Mayor Daugherty denied the grievance. (*Id.*, ¶¶ 33-34.)

Plaintiff then prepared a memo that allegedly documented a conversation he had with Trachta in which Trachta set forth complaints about Plaintiff's work performance.

3

(SOF, ¶¶ 37-38.) On August 9, 2012, Trachta prepared a memo setting forth additional issues with Plaintiff's work performance, and on August 21, 2012, Trachta sent a memo to Mayor Daugherty regarding complaints about Plaintiff's handling of an incident. (*Id.,* ¶¶ 39-41.)

In September of 2012, Lahovski was fired from the Borough Police Department due to his handling of a domestic dispute, and Plaintiff filed a grievance on behalf of the Police Association regarding Lahovski's termination. (*Id.*, ¶¶ 43-44.) After Lahovski's firing, Plaintiff provided him with a stack of documents that he found on the fax machine at the police station. (Schleig Dep, Dkt No. 70, Exh. A, p. 53.) These documents included an application for employment at another police station from Daniel Troxell, and included a note from Plaintiff that the documents "would be maybe useful to [Lahovski] for his defense" in his pending grievance. (*Id.*, p. 57, 60-61.)

On February 26, 2013, Trachta prepared Plaintiff's annual performance evaluation, and as he had the prior two years, rated Plaintiff's overall performance as "Needs Improvement." (*Id.,* ¶¶ 52-53.) On August 7 and August 12, 2013, Trachta wrote to Mayor Strye regarding additional performance issues that he had with Plaintiff. (*Id.,* ¶¶ 61-62.) On April 24 and April 29, 2013, a borough resident complained that Plaintiff had been parked outside the house of a Borough Councilman while on duty. The resident also provided photographic evidence of this. (April 24, 2013 Email, Dkt No. 70, Exh. C.) As a result of this, Plaintiff was asked to complete shift logs for four shifts.

In 2013, Robert Reimer, an employee of Nazareth Borough, won a National Build a Better Mousetrap contest. (SOF, ¶ 70.) As a result, the Borough gave Mr. Reimer a rubber mouse in a mousetrap as part of his recognition. (Dkt No. 70, Exh. F.)

On Thanksgiving Day, 2013, Plaintiff had a discussion with Officer Troxell at the police station, while Troxell was "in the process of being hired full-time with the Borough of Nazareth." (*Id.*, ¶¶ 71-72.) Troxell had testified in a grievance hearing related to Lahovski's termination in the preceding days, and was upset because "the evidence that [Lahovski] had obtained or possessed hurt him (Troxell) in his credibility." (*Id.*, ¶¶ 73-74.) Plaintiff wrote a statement regarding his Thanksgiving Day conversation with Troxell, in which he stated, *inter alia*:

> Dan Troxell continued to gone in making a comment that "when I find out, who the person I helping Fred with all of the copies of incident, involving me, I am going to sue that person, get that person fired, try an file criminal charges against that for theft, and go after the person physically, hurt them bad. I mean I'm going to physically hurt them, and do the same to their entire family.". . . "Let me tell you something bud, I am very so serious right now, and not joking. That the Chief and the Borough's Attorney are going to ask at the next hearing for Fred, who gave him the copies of the reports. When the Chief finds out he's going to tell me. The moment he tells me that person's life is OVER! Because I have four children and a wife to provide for, and if someone catches me doing something illegal I'm and gets me fired, I going to do worst to them and their entire f\*\*king family!" "I need to know who gave Fred a copy of my RESUME!" . . . "But let me tell you right now that if it's you I won't care that you're my friend or that fact that you helped me get all the jobs at your house and you mom and dad's place. I'm serious what I said before." (all *sic*)

(*Id.,* ¶ 75.) Plaintiff testified at an Unfair Labor Practices hearing on July 13, 2015 that "Officer Troxell, he wants to find out, he needs to find out who is helping the Association for Fred Lahovski because he wants to get him." (*Id*., ¶76.) Plaintiff believes Troxell is motived by a desire to use Lahovski's termination to get himself a position as a full-time police officer. (*Id.,* ¶ 77.)

On December 1, 2013, a Borough resident reported the theft of an iPad from her business, and Plaintiff responded to the call. (*Id.,* ¶¶ 78-79.) The resident managed to

5

locate the iPad at a McDonald's in Stroudsburg, Monroe County, within the jurisdiction of the Stroud Regional Police Department. (*Id.*, ¶¶80-81.) The resident drove to Stroudsburg, identified her iPad in the possession of L.S., an individual who used to live upstairs from her business, and the Stroud Regional Police arrested L.S. (*Id.*, ¶¶ 82-84.) The Stroud Regional Police then transported L.S.to a Rita's Water Ice in Northampton County, where Plaintiff met the police and found L.S. in handcuffs. (*Id.*, ¶¶ 85-86.) Plaintiff then put his own handcuffs on L.S., put him in the back of Plaintiff's patrol car, radioed that he had a man in custody, and gave L.S. his Miranda warnings. (Dkt No. 70, Exh. A, 134-135.) At that time, the only charge Plaintiff knew that L.S. could be charged with was possession of stolen property in Stroudsburg. (*Id.*, p. 136.) Plaintiff did not have an arrest warrant for L.S., nor did he complete a Waiver of Extradition. (SOF, ¶ 87.) Plaintiff alleges that L.S. made a verbal confession in the back of the patrol car, then Plaintiff documented that he had obtained a written confession. (*Id.*, ¶¶ 89-90.) Plaintiff charged L.S. with possession of stolen property, despite the fact that the offense occurred in Monroe County. (*Id.,* ¶¶ 90-91.)

On December 3, 2013, the resident in question made a written complaint regarding Plaintiff's handling of the arrest, and on December 5, 2013, Trachta met with Plaintiff to discuss it. (*Id.,* ¶¶ 92-93.) During that meeting, Plaintiff admitted that he charged L.S. with a crime that occurred outside his jurisdiction, and responded that it was "crystal clear" when Trachta explained to him why he had made errors in the arrest. (*Id.,* ¶¶ 94, 96.) Trachta also explained to Plaintiff that he had vacated Plaintiff's arrest and the charges against L.S. in order to protect Plaintiff. (Dkt No. 70, Exh. G.) After this meeting

with Trachta, Mayor Strye witnessed Plaintiff crying in the police station. (Strye Dep., Dkt No. 70, Exh. I, pp. 73-74.)

A formal interview was then scheduled with regard to potential disciplinary proceedings, and the Borough hired an independent investigator, Dan Monek, to investigate the arrest of L.S. at the request of the union. (*Id.,* ¶¶ 97, 99.) Plaintiff refused to answer Monek's questions, causing Mayor Strye to write Plaintiff and direct him to cooperate in the investigation that had been requested by the union. (*Id.,* ¶ 100.) However, Plaintiff was never disciplined for his handling of the arrest of L.S. (*Id.,* ¶ 101.)

In January of 2014, two Borough employees provided written statements regarding seeing Plaintiff "very upset" and questioning Plaintiff's emotional well-being. (*Id.,* ¶¶ 102-103.) When informed about these reports, Mayor Strye became concerned about Plaintiff's well-being and decided to send Plaintiff for a fitness-for-duty exam. (*Id.,* ¶ 104.) The exam took place on February 7, 2014. (*Id.,* ¶105.) Mayor Strye contacted Trachta and informed him that Plaintiff's exam was completed, and Trachta became alarmed when no one could locate Plaintiff. (*Id.*, ¶ 112.) In attempting to locate Plaintiff, Trachta left several voice mails for Plaintiff, left a voice mail at Plaintiff's home, and contacted the Northampton County 911 Center. (*Id.,* ¶¶ 107-109.) Trachta stated that Northampton County arranged for a Palmer Township officer to go to Plaintiff's home and check on him. (*Id.,* ¶ 111.) When Plaintiff finally called Trachta, he stated that his exam had just ended. (*Id.,* ¶ 112.)

Dr. Gordon, the provider performing the fitness-for-duty exam, determined that Plaintiff was fit for duty, but recommended that he "should have at least 10 counseling sessions to help him with stress and emotional coping." (*Id.*, ¶ 118.) The Borough agreed

7

to pay for the 10 counseling sessions, of which Plaintiff attended "a few." (*Id.,* ¶¶ 119-120.) The counseling sessions were scheduled for while Plaintiff was on duty, and he was paid to attend them. (*Id.*, ¶¶ 121-122.) Eventually, Plaintiff's schedule was changed, and the Borough did not require him to attend the sessions while he was not on duty. (*Id.,* ¶¶ 123-124.)

On January 13, 2014, Plaintiff provided testimony in an arbitration originally scheduled for October 22, 2013, regarding the termination of Lahovski. (*Id.,* ¶¶ 126-127.)

On August 9, 2014, Plaintiff worked overtime without getting approval from Trachta. (Oct. 15, 2015, Arbitration Decision, Dkt No. 70, Exh. N, pp. 1, 5.) Accordingly, Plaintiff was not paid for the unauthorized hours and the union filed a grievance. (SOF, ¶¶ 128-130.) Subsequently, then Deputy Chief Miller issued a counseling notice to Plaintiff regarding working the shift without authorization, then met with Plaintiff on November 14, 2014, to discuss the violation. (*Id.,* ¶¶ 131-132.) Miller informed Plaintiff that if he withdrew his pending grievance related to his shift, he would only receive counseling with regard to the L.S. incident. (*Id.,* ¶ 134.)

On July 13, 2015, Plaintiff testified at an Unfair Labor Practices hearing that had been scheduled seven months earlier regarding the actions of Trachta and Troxell. (*Id.,* ¶¶ 135-136.) On July 29, 2015, an accident occurred, and Plaintiff informed Officer Pompei that it must be reported to the state police because it involved damage to a telephone pole, which is PennDOT property. (Aug. 10, 2015 Email, Dkt No. 70, Exh. O.) Officer Pompei then sent an email to Miller outlining this conversation, and on July 30, 2015, Plaintiff got an email from Miller questioning why Plaintiff had incorrectly instructed Pompei that the motor vehicle accident needed to be reported to the State Police. (SOF, ¶ 137.)

Officer Kahle, who was present at the time of Plaintiff's conversation with Officer Pompei provided a statement that supported Pompei's version of events. (Aug. 7, 2015 Stmt, Dkt No. 70, Exh. P.) Upon being questioned by Miller via email about his incorrect belief, Plaintiff tried to blame Officer Kahle for the incorrect information. (Exh. O.) Plaintiff knew that the only time accidents need to be reported is when there was an injury or when a vehicle needed to be towed. (SOF, ¶ 141.) In response to Miller's July 30, 2015, email questioning the reporting of an accident, Plaintiff stated "I thought that the vehicle that struck the light pole was towed. I told him later that it was a reportable accident with property damage as a result. I didn't realize that no vehicle was towed until later." (*Id*., ¶ 144.) Miller believed this was a false statement and therefore, on August 26, 2015, initiated an investigation into Plaintiff. (*Id.,* ¶ 145.) Subsequently, Plaintiff was issued a two day suspension for making false statements during an investigation. (Employee Viol. Notice, Dkt No. 70, Exh. Q.) Plaintiff never filed a grievance for this suspension.

On August 6, 2015, Plaintiff testified at a grievance arbitration regarding counseling that he received for working an overtime shift without prior authorization and improperly completing a motor vehicle accident form so as to imply blame on the wrong driver. (*Id.,* ¶ 139.) This grievance had been pending for months prior to Plaintiff's testimony. (*Id.,* ¶ 140.)

Plaintiff complains that he was disciplined for an incident in which he arrested three individuals at a local school and put all three individuals on a single incident report, after Trachta asked him to create three separate files for the arrest. (*Id.,* ¶¶ 153-154.) This incident was addressed in Plaintiff's Annual Performance Evaluation for 2014, although

9

Plaintiff was not disciplined in any way with regard to the incident. (*Id.,* ¶¶ 157-159, 161.) Plaintiff also complains that in June of 2014, Trachta accused him of going shopping after faking an illness and calling out from work. (*Id.,* ¶¶ 162-163.) Plaintiff admits that, after calling out sick, he went to a store to buy a new pair of boots. (Exh. A, pp. 289-290.)

## IV. DISCUSSION

### A. PLAINTIFF'S FACTUAL OPPOSITION

First, it is necessary to discuss Plaintiff's response to Defendants' Motion for Summary Judgment. Federal Rule of Civil Procedure 56(c)(1) states:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A) Citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answer, or other materials; or
>
> (B) Showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

F.R.C.P. 56(c)(1). Further, "[i]f a party fails to properly . . . address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion; [or] grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2) and (3). In the instant case, despite responding to Defendants' Statement of Material Facts and setting out his own counterstatement of facts in his brief, Plaintiff's fails to support a single fact with any citation to the record or to cite any testimony that supports his allegations. As Plaintiff has failed to properly rebut

a single one of Defendants' factual assertions by citing to the record, I may consider Defendants' facts undisputed for the purposes of this motion.

### B. FIRST AMENDMENT RETALIATION

Plaintiff's Complaints contain claims of retaliation under the speech, petition, and association clauses of the First Amendment. The First Amendment to the Constitution states:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

*U.S. Const., Amend. I*. Public employees have a First Amendment right to speak freely on matters of public concern, but this freedom must be balanced against the efficient operation of the workplace. *Connick v. Myers*, 461 U.S. 138, 146 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). Plaintiffs making First Amendment retaliation claims "must show (1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).

### 1. **Protected Activity**

First Amendment protections differ between employees speaking on matters of public concern and employees speaking pursuant to their official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* The Supreme Court has held if an employee speaks on a matter of

public concern, the employee's speech is protected; conversely, if the employee has spoken pursuant to his or her official duties, there is no First Amendment protection. *Id.*; *see also Morris v. Philadelphia Housing Authority*, 487 Fed.Appx. 37, 39 (3d Cir. 2012). Here, Defendants do not argue that Plaintiff's actions did not fall within the protections of the First Amendment. Accordingly, I move on to the second prong of the test.

### 2. Retaliatory Actions

First Amendment retaliation requires a showing that defendants' retaliatory actions were sufficient to deter a person of ordinary firmness from exercising his or her rights. "[W]e have held that, in certain circumstances, a public employee may bring a cause of action alleging that his or her First Amendment rights were violated by retaliatory harassment . . . even if he or she cannot prove that the alleged retaliation adversely affected the terms of his or her employment." *McKee v. Hart*, 436 F.3d 165, 169 (3d Cir. 2006). "Courts have declined to find adverse action where the 'alleged retaliatory acts were criticism, false accusations or verbal reprimands.'" *Revell v. City of Jersey City*, 394 Fed. Appx. 903, 906 (3d Cir. 2010), *quoting Brennan*, 350 F.3d at 419. Further, "[g]enerally, an internal investigation alone does not constitute an adverse employee action." *Lakkis v. Lahovski*, 994 F.Supp.2d 624, 633 (M.D. Pa. 2014).

In the instant matter, Plaintiff has alleged an abundance of retaliatory acts:

- On November 28, 2013, Defendant Troxell had a conversation with Plaintiff in which he was threatening toward the unknown person who had provided Lahovski with information to use in his suit against Defendants. (ECF No. 40, ¶¶ 58-61.)

- On January 9, 2014, Trachta informed Plaintiff that he was no longer permitted to have his police uniforms tailored. (ECF No. 40, ¶ 66.)

- On January 11, 2014, Plaintiff believed that he discovered a hidden camera in the secure section of the police station, and when he informed

- Trachta, Trachta used obscene language towards him. (ECF No. 40, ¶ 67.)

- On January 12, 2014, when Plaintiff testified at Lahovski's hearing, Trachta threatened Plaintiff and implied that his job was in jeopardy because of his testimony. Plaintiff then discovered a plastic rat in a rat trap in the hearing room positioned to intimidate him. (ECF No. 40, ¶ 69.)

- On January 28, 2014, Mayor Strye required Plaintiff to undergo a psychiatric evaluation, which was later rescheduled to February 4, 2014. (ECF No. 40, ¶¶ 70-71.)

- On February 10, 2014, Trachta informed the County 911 call center, another local police department and Plaintiff's wife that Plaintiff had participated in a fitness-for-duty examination. (ECF No. 40, ¶ 73.)

- In February of 2014, Plaintiff was asked to meet with a private investigator that was looking into the propriety of one of Plaintiff's arrests. (ECF No. 40, ¶¶ 75-76.)

- On February 13, 2014, Trachta ordered Plaintiff to return his four-wheel drive police vehicle to the station during a snow storm. (ECF No. 40, ¶ 78.)

- On March 6, 2014, Trachta failed to notify Plaintiff that there were open shifts. (ECF No. 40, ¶ 80.)

- In March of 2014, Plaintiff was reprimanded to failing to prepare separate arrest reports for three (3) separate individuals. (ECF No. 40, ¶ 81.)

- On March 14, 2014, Mayor Strye required Plaintiff to attend counseling sessions. (ECF No. 40, ¶ 87.)

- Trachta initiated an internal affairs investigation after Plaintiff took possession of an ornamental light pole that had been damaged in a car accident. (ECF No. 40, ¶ 82.)

- In June of 2014, Trachta accused Plaintiff of faking an illness when he took two days off work. (ECF No. 40, ¶ 84.)

- In August of 2014, Trachta investigated Plaintiff for working an unauthorized overtime shift. (ECF No. 40, ¶ 86.)

- On November 14, 2014, Deputy Chief Miller attempted to persuade Plaintiff to withdraw a labor grievance. (ECF No. 40, ¶ 90.)

- In December of 2014, Plaintiff was the subject of an internal affairs investigation. (ECF No. 40, ¶¶ 62-65.)

- In July of 2015, Plaintiff testified at an unfair labor practices hearing related to complaints made by the Police Association. (Case No. 16-4654, ECF No. 5, ¶ 91.)

- In August of 2015, Plaintiff testified at a grievance hearing related to a complaint that had been made against Miller. (Case No. 16-4654, ECF No. 5, ¶ 92.)

- Defendants initiated an internal affairs investigation of Plaintiff, and as a result of the investigation, Plaintiff was suspended for two days in November of 2015. (Case No. 16-4654, ECF No. 5, ¶¶ 93-94.)

The low standard for such retaliation claims requires a plaintiff demonstrate that the retaliatory conduct by the defendant was more than *de minimus*. *Smith,* 355 Fed. Appx. at 668.

In the instant matter, many of Plaintiff's claims of retaliation fall into the *de minimus* category and cannot sustain a claim for retaliation based upon Plaintiff's union activity. I find that Plaintiff's not being allowed to have his uniforms tailored, being yelled and cursed at, having Trachta call the County 911 center looking for him due to his unexplained absence, being asked to meet with a private investigator at the request of his union, being forced to return his police four-wheel drive vehicle in a snowstorm, reprimands, accusations, initiations of investigations and a request to resolve an outstanding grievance are so minor that they would not deter a police officer of ordinary firmness from exercising his constitutional rights. Plaintiff not being called for open shifts is also *de minimus*, as an arbitrator has already ruled that the Borough did not violate the Collective Bargaining Agreement in its scheduling practices. Further, the

14

internal affairs investigations of Plaintiff are also insufficient to sustain a retaliation claim. *See Lakkhis*, 994 F.Supp.2d at 633. Plaintiff admitted that he was never suspended or given any formal discipline until November of 2015. That suspension was clearly warranted punishment after an internal affairs investigation. I find all of these to be *de minimus* issues that are not worthy of classification as "retaliatory actions." Accordingly, summary judgment must be granted as to Plaintiff's claims arising from all of these *de minimus* issues. I find that only the claims of retaliation arising from Plaintiff's November 28, 2013, encounter with Troxell, his fitness-for-duty examination, his counseling sessions and his November of 2015 suspension survive summary judgment on the second prong of the test for First Amendment retaliation.

     **3.**     **Causal Connection**

The third prong under First Amendment retaliation requires a causal connection between the protected activity, Plaintiff's speech, and the retaliatory action taken. *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The Third Circuit stated:

> To establish the requisite causal connection, the plaintiff must prove either: 1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or 2) a pattern of antagonism coupled with timing to establish a causal link. In the absence of that proof the plaintiff must show that from the evidence gleaned from the record as a whole the trier of the fact should infer causation.

*Cooper v. Menges*, 541 Fed. Appx. 228, 232 (3d Cir. 2013*), citing Lauren W. ex rel Jean W.*, 480 F.3d at 267.

Typically, an unusually suggestive temporal proximity between the protected conduct and the alleged retaliatory act is necessary to establish causation. [T]he Third Circuit Court of Appeals has suggested that a temporal proximity of two days is sufficient

15

to establish causation, *see Jalil v. Avdel Corp.,* 873 F.2d 701,709 (3d Cir. 1989,) while a delay as short as three weeks between protected speech and termination has been found insufficient to establish causation. *See Thomas v. Town of Hamilton*, 351 F.3d 108, 114 (3d Cir. 2003). Several courts within this Circuit have found that a period of time greater than a few days is too long to establish causation through temporal proximity alone. *See Kier v. F. Lackland & Sons, LLC*, 72 F. Supp.3d 597 (E.D. Pa., 2014) (one week between employee's complaint and termination insufficient to establish causation); *Fischer v. Transue*, 2008 WL 3981521 (M.D. Pa., Aug. 22, 2008) (twenty-two days between employee's complaint and initiation of internal investigation too lengthy to infer causation).

In a case such as the instant one, in which the Plaintiff alleges an ongoing period of protected activity, the evaluation of causation is a bit more complex. In *Chinniah v. East Pennsboro Twp.*, 2016 WL 5799048 (M.D. Pa. Aug. 10, 2016), *report and recommendation adopted* 2016 WL 5719830 (M.D. Pa., Sept. 30, 2016), the court discussed a similar matter with plaintiffs who claimed that numerous discrete acts during the course of an eight year lawsuit were retaliatory. The court stated:

> [T]he Court notes that the Chinniahs consistently display a preternatural, global, subjective sensitivity to alleged retaliation, ascribing some retaliatory motive to virtually every action that occurs. Although the filing and prosecution of the 2008 Lawsuit is protected by the First Amendment, the Chinniahs fail to allege sufficient facts to plausibly demonstrate that this civil case was a substantial motivating factor in any adverse actions subsequently taken by Kuntzelman and Dunkle. Instead, the Chinniahs attempt to tie disparate events, committed by different actors, together into a seamless web of retaliation, by arguing that the entire eight-year pendency of the 2008 Lawsuit is one ongoing constitutionally-protected activity and inferring that any adverse actions taken by the Township Defendants during this period therefore must evince retaliation.

*Id.* at *7 (internal citations omitted).

In the instant matter, Plaintiff testified that he has been involved in the union since 2009, and that from 2009 to 2015, he could not recall a period of more than one month in which there was no pending grievance arbitration. During that time period, Plaintiff was involved in twenty-three (23) grievance arbitrations and two (2) Unfair Labor Practice proceedings. As in *Chinniah*, Plaintiff has taken numerous innocuous incidents involving different actors throughout that 6 year period and attempted to establish a claim for retaliation.

In terms of Plaintiff's testimony at Lahovski's grievance hearing, for which he claims he was retaliated against by Troxell confronting him in November of 2013 and Trachta investigating his handling of the L.S. arrest in December of 2014, both of these alleged retaliatory acts took place prior to Plaintiff's testimony in January of 2014.[1] Clearly, Plaintiff's claimed protected status, involvement in the police union, existed for several years before these two alleged retaliatory acts. There is no plausible inference in this situation that can be made that Troxell confronted Plaintiff in November of 2013 or an investigation was started into the L.S. arrest because of Plaintiff's testimony at a grievance hearing that had not even occurred yet.

Next, Plaintiff argues that his November of 2015 suspension was retaliation for testimony that he provided in July and August of 2015. However, I find that there are no facts to support causation with regard to this suspension. Both the Unfair Labor Practice complaint that Plaintiff testified about in July of 2015 and the grievance that he testified about in August of 2015 were filed months before the hearings, and the Borough was aware of them long before the November 2015 suspension. Plaintiff's mere belief or

---

[1] Plaintiff's testimony was originally scheduled for October 22, 2013, but didn't take place until January 13, 2014.

17

desire to connect this testimony to his suspension does not make it true. Not only is the temporal proximity too great, even if it would "ordinarily be suggestive of a causal link, it cannot support an inference of retaliation [here] because the evidence here negates such an inference." *McLaughlin v. Fisher*, 277 Fed. Appx. 207, 219 (3d Cir. May 5, 2008). I find that there is no evidence of a causal connection between Plaintiff's 2015 testimony and his suspension sufficient to prove a claim of retaliation. Furthermore, the suspension appears to be based upon sufficient cause.

Lastly, Plaintiff argues that the request that he attend a fitness-for-duty evaluation was retaliation for his January 13, 2014 testimony at an arbitration regarding Lahovski. As discussed above, this arbitration was originally scheduled for October 20, 2013, and rescheduled to January of 2014. In the meantime, several individuals observed Plaintiff crying in the police station, creating a concern regarding his mental and emotional wellbeing. Therefore, the Mayor sent him for the fitness-for-duty examination, which led to a doctor recommending counseling sessions. A review of the evidence shows that this examination and subsequent counseling was motivated by attempts to make sure Plaintiff was not a danger to himself or others, and was not motivated by his testimony at the January of 2014 arbitration. Accordingly, it is clear that any claim of causation in this matter falls far short of the exacting legal standards that apply to retaliation claims, and summary judgment is properly granted for all defendants.[2]

---

[2] As I have found that Plaintiff's alleged acts of retaliation are either *de minimus* or lack a causal connection to Plaintiff's union activity, summary judgment is granted to defendants, and it is not necessary for me to address the remaining arguments that Defendants presented in support of their motion for summary judgment.

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is granted and this case is dismissed. An appropriate order follows.